UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | NO. 2:11-CR-03 |
| | ) | |
| TOMMY BLAIR, SAMUEL THOMAS | ) | |
| CLARK, and CHRISTINA MICHELLE | ) | |
| WHITE SMITH ROGERS | ) | |

**MEMORANDUM OPINION AND ORDER**

On January 11, 2011, the federal grand jury indicted Tommy Blair ("Blair"), Samuel Clark ("Clark"), and Christina Rogers ("Rogers") for, among other things, conspiring to defraud TruPoint Bank by obtaining a $3.57 million loan. On May 27, 2011, Clark entered a guilty plea and Blair and Rogers were convicted by a jury on August 15, 2011. Rogers was sentenced on June 11, 2012, and Blair was sentenced on June 12, 2012. Clark was sentenced on July 2, 2012. In each case, the Court ordered restitution but left the amount of the restitution for determination after the government submitted an updated restitution request from the victim, TruPoint Bank ("TruPoint").

The government submitted the updated request on June 25, 2012, [Doc. 150], and Rogers and Blair have objected, [Docs. 154, 155]. The government now seeks the sum of $4,196,958.60 in restitution to TruPoint as follows:

| | | |
|---|---|---|
| **Note Principal Balance:** | $ | 3,563,496.08 |
| Late Charges: | $ | 7,999.84 |
| Interest: | $ | 197,930.38 |
| Expenses: | $ | 24,020.13 |
| **Subtotal:** | **$** | **3,793,446.43** |
| Payments made by customer: | $ | - |
| Collateral Sale - Broadway Car Wash 04/28/08 | | 230,000.00 |
| Collateral Sale - Pit Stop Car Wash and Rentals 05/24/10 | | 600,000.00 |
| Collateral Sale - 222 Broadway Property 06/07/12 | $ | 38,500.00 |
| Interest on $2,733,496.08 @ 7.75 from 01/31/07 to 04/07/11 | $ | 1,154,621,54 |
| Interest on $2,733,496.08 @ 3.50 from 04/07/11 to 02/27/12 | $ | 89,868.44 |
| Interest on $2,733,496.08 @ 3.50 form 02/28/12 to 06/12/12 | $ | 27,522.19 |
| **Deficiency Total Owed by Customer** | **$** | **4,196,958.60** |

The Mandatory Victims Restitution Act of 1996 ("MVRA") provides that a sentencing court shall order restitution, in addition to any other penalty, to a victim "directly and proximately harmed as a result of the commission" of an "offense against property." 18 U.S.C. § 3663A(a)(1), (a)(2), and (c)(1)(A)(ii). The court shall order restitution "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The government must prove the amount of the restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e).

If multiple defendants are culpable for the "loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss." 18 U.S.C. § 3664(h). At

sentencing, the Court ordered that the restitution obligation of Blair, Clark and Rogers be joint and several. No defendant has suggested otherwise and, in cases such as this, where each defendant "played a crucial role" in the fraud, "there is no reasonable basis for apportionment." *United States v. Bogart*, 576 F.3d 565, 575 (6th Cir. 2009).

In cases involving property loss, the victim is entitled to return of the property, 18 U.S.C. § 3663A(b)(1)(A), or if the return of property is "impossible, impracticable, or inadequate," the victim is entitled to the greater of the value of the property on the date of the loss or the date of sentencing less "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). Generally speaking then, the court calculates restitution by "determining the amount of the unpaid balance due on the fraudulent loan, less the value of the real property collateral as of the date the direct lender took control of the property" in cases involving fraudulent schemes to obtain secured real estate loans from lenders. *See United States v. Yeung*, 672 F.3d 594, 601 (9th Cir. 2012).

Usually, "the 'full amount of the victim's loss,' particularly where the victim is a financial institution, includes bargained for interest and finance charges." *United States v. Jimenez*, 513 F.3d 62, 87 (3d Cir. 2008). *See also United States v. Shepard*, 269 F.3d 884, 886 (7th Cir. 2001) (holding that "[r]estitution should include interest to make up for the loss of the funds' capacity to grow. . . because the money came from an interest-bearing account"); *United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir. 1993); *United States v. Rochester*, 898 F.2d 971, 982-83 (5th Cir. 1990) (affirming the district court's order to pay the amount owing on the loan from the date certain plus all interest

accruing from that date until the date of payment).[1]

Calculating the current unpaid balance of the fraudulent loan is relatively easy. The unpaid principal is $3,563.496.08. Interest accrued through January 31, 2007, in the amount of $197,930.38. Interest through April 7, 2011, is $1,154,621.54 (7.75% per annum) and $117,390.63 from April 7, 2011, through June 12, 2012 (.250% above New York prime). This totals $5,033,438.63, exclusive of requested late charges of $7,999.84 and expenses of $24,020.13. The Court finds that the late charges, which do not make up for loss of the funds' capacity to grow as does interest, and the expenses, which are completely unexplained, are not properly included in the restitution order.

The more difficult question here involves the question of the value of the real property collateral as of the date TruPoint took control of that property. TruPoint's affidavit shows a credit for these parcels of real estate collateral sold by the bank: (1) Broadway Car Wash (sold 4/28/08)--$230,000; (2) Pit Stop Car Wash and Rental (sold 5/24/10) -- $600,000; and (3) 222 Broadway property (sold 6/7/12) -- $38,500. As defendants note, TruPoint credits $868,500, the amount actually received by the bank, against the unpaid balance on the loan. Defendants are correct, however, that it is not the amount received which must be deducted from the loan balance but rather the value of the collateral "as of the date the property was returned" to TruPoint Bank, i.e. the date TruPoint took control of the property.

A "lender generally takes control on the date the lender either (1) receives the net proceeds

---

[1] Both Rogers and Blair cite USSG § 2B1.1, app. note 3(D), for the proposition that "[i]nterest and expenses are excluded as items of loss." While that is correct for the purposes of determining "loss" for calculating the advisory Guidelines sentencing range, it has no application on the question of restitution, notwithstanding the representation that "[d]efendants do[ ] not believe that there is any opposition to this request by the United States."

4

from the sale of the collateral to a third party at the foreclosure sale or (2) takes title to the real estate collateral at the foreclosure sale, at which time the new owner had the power to dispose of the property and receive compensation." *Yeung*, 672 F.3d at 601 (citing *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) and *United States v. Smith*, 944 F.2d 618, 625-26 (9th Cir. 1991)) (citations omitted). It appears to be undisputed that TruPoint had taken control of the real estate collateral by January 31, 2007, and it is as of that date, therefore, that the Court must determine the value of the real estate returned in order to determine the restitution owed in this case.

TruPoint clearly claims that the value of the real estate collateral on the date it took control of the property is established by the actual sale prices for the collateral, despite the fact that it held possession of one of the parcels of the real estate collateral for about 15 months before its sale (Broadway Car Wash), of a second parcel for about three years and four months (Pit Stop Car Wash and Rentals), and of the third parcel for about five years and five months (222 Broadway property). The defendants argue, however, that these sale prices are not indicative of the value of the real estate collateral at the time of the foreclosure. The Court agrees.

Defendants point to other evidence in the record as a better indication of the value of the real estate collateral at the relevant time, i.e. January 31, 2007. First they point to the oral appraisal of David Harris ("Harris"), MAI, of $4.4 million given to the bank just prior to the loan closing in April, 2006, confirmed by a written appraisal report in May, 2006. [Doc. 154-3]. Secondly, they point to a letter written by Cameron L. Forrester ("Forrester"), Executive Vice President & CLO of TruPoint, to FBI Special Agent Lane P. Rushing on February 9, 2007, which states that "TruPoint Bank after considerable evaluation has determined that the amount of loss in this loan" is "$1,263,496.08 Principal Loss" and "$180,279.64 Interest Loss." [Doc. 154-4]. Finally, they point

to deposition testimony[2] of Forrester on May 5, 2009, that TruPoint had sold one of the car washes for $250,000, (apparently the Broadway Car Wash)[3] , had the "Truck Wash" on the market for $200,000 (apparently the 222 Broadway property), and had an offer for the "Carwash on Oakland" (apparently the Pit Stop Car Wash and Rentals) for $1.4 million.

From all of this, the defendants conclude that no restitution should be ordered and that "the value of the property returned to the bank actually exceeds any amounts loaned for its purchase." [Doc. 154 at 3]. They argue that the most "accurate" and "independent" valuation of the property is the Harris appraisal, done some ten months before TruPoint acquired control of the real estate collateral. If the Court does not base its valuation on the Harris appraisal, then defendants argue that the February 9, 2007 letter from Forrester is more accurate than his affidavit provided years later. Lastly, defendants argue that the Court should rely on the 2009 deposition testimony of Forrester. The Court agrees with defendants in part.

As for the Harris appraisal, the Court finds that it is not persuasive with respect to the value of the subject real estate collateral as of January, 2007. For one thing, it was done ten months before the bank took control of the collateral. For a second thing, Harris's appraisal appears to be suspect. He provided it orally initially, something which in this Court's experience is largely unheard of, especially with a loan of this size. Furthermore, he placed a value on the intangible assets associated with the subject properties based only on his knowledge of the type of businesses operated on these properties without the benefit of any detailed income and expense data except for some incomplete

---

[2] TruPoint has filed a civil suit against the defendants for the unpaid balance on the loan.

[3] This differs from Forrester's current affidavit in which he listed the amount credited to the loan from his sale to be $230,000. Presumably, TruPoint has deducted the cost of the sale from the amount credited to the loan balance.

(and possibly fraudulent) tax return information.

As for the May, 2009 deposition testimony by Forrester, it too is of little value to the Court in determining the value of the real estate collateral as of January, 2007. It was given more than two years after the bank acquired control of the properties and establishes nothing more than that TruPoint had sold one of the parcels of real estate for $250,000 (April, 2008), that TruPoint had listed a second parcel of real estate for $200,000, and that it had an offer, but no agreement, on the third parcel for $1.4 million. Neither a listing price nor an offer, without anything more to establish both a willing and able buyer, indicates the value of the real estate collateral in May, 2009, much less January, 2007.

That leaves as the only evidence of value reasonably close to January, 2007, the February, 2007 letter of Forrester to SA Rushing. Although short on details, the letter establishes by a preponderance of the evidence, that, within ten days of control over the real estate collateral, TruPoint, "after considerable evaluation," determined its principal loss to be $1,263,496.08, establishing the value of the collateral at $2,300,000 ($3,563,496.08 minus $1,263,496.08).

For these reasons, the Court **ORDERS** Blair, Clark and Rogers to pay restitution in the total amount of $1,443,775.73 ($1,263,496.08 principal plus $180,279.65 interest as of February 9, 2007[4]). Further, the Court finds that interest on the restitution from February 10, 2007 through the current date is properly included in the restitution ordered. There is no proof in the record, however, as to the amount of that interest and the Court declines to attempt to calculate the amount itself. Section 3664(d)(5) permits the victim, within 60 days after the discovery of further losses, to petition

---

[4] Forrester's current affidavit lists accrued interest as of January 31, 2007 as $197,930.38. The discrepancy is not explained and the Court will use the lower number as the basis of its restitution order.

the Court for an amended restitution order upon a showing of good cause. Given the Court's present order, such good cause exists and the Court will entertain an amended petition for the interest lost on the amount of restitution ordered from February 10, 2007, through the date of the petition. The petition must not only set out the total amount requested but must also explain how the amount was calculated.

    So ordered.

    ENTER:

                                               s/J. RONNIE GREER
                                   UNITED STATES DISTRICT JUDGE